Berryman *v.* Graham.

---

BERRYMAN and wife, appellants, and GRAHAM, respondent.

1. Objection to a witness on the ground of incompetency, must be made when he is offered for examination, if the incompetency be then known. The adverse party will not be permitted to sit by and hear the witness examined without objection, and failing to make anything out of him, to interpose the objection to competency.

2. A defendant, ignorant of facts which entitle him to file a cross-bill, until the depositions of complainant's witnesses reveal such facts, if he files his cross-bill without unnecessary delay, cannot be deprived of the benefit of such facts at the complainant's instance, where he was willfully kept in ignorance of them by a person acting in concert with the complainant, and who had been recommended by complainant to the defendant as a trustworthy person in the transaction, but whose fraudulent conduct was the ground of the cross-bill.

3. Fraud in this case held to be established, but even if it was perpetrated without the complainant's knowledge, yet there was clearly such mistake as to entitle the defendant to relief in this court.

4. Proper parties are not always necessary parties, and where no objection to want of a party as a necessary party was made below, nor such want made a ground of appeal, this court will not permit such question to be raised, unless the party omitted is an indispensable party, and justice cannot be done without him.

The opinion of the Chancellor is reported in 4 *C. E. Green* 29.

*Mr. C. H. Voorhis* and *Mr. Gilchrist*, for appellants.

*Mr. L. Zabriskie* and *Mr. J. Wilson*, for respondent.

The opinion of the court was delivered by

VAN SYCKEL, J.

The object of the bill filed by the respondent in this cause, was to foreclose a mortgage, dated August 23d, 1865, for $9276.51, given by Berryman and wife, to Graham, upon Mrs. Berryman's farm. The cross-bill filed by Berryman and wife, seeks to have the mortgage set aside, and the notes of Berryman thereby secured, delivered up to be cancelled, on the ground of fraud in the consideration.

Berryman purchased for his wife from Graham, the lease of a dry goods store in the city of New York, and the stock of dry goods contained in it, for which he gave to Graham his six several promissory notes, dated August 23d, 1865, payable to the order of one Alexander Just, one for $1695.-82, one for $1724.98, one for $1754.14, and three for $1425.50 each, payable respectively in three, six, nine, twelve, fifteen and eighteen months. The contract was, that Graham was to sell the lease and the goods in the store, for the original cost of the goods, less ten per cent. The cross-bill alleges that in taking the account of the stock there was a fraudulent over estimate, both as to quantity and original cost of the goods, and avers that $5000, which has been paid on the notes as they matured, was equal to the value of the goods at the contract price.

Graham, the complainant in the original suit, was sworn as a witness on his own behalf, without objection at the time, and was cross-examined by the defendants' counsel. At the closing of complainant's testimony, and before any evidence had been taken on the part of the defendant, objection was made to the competency of Graham, and testimony was taken after this by both parties. Had objection been made to Graham at the time he offered himself as a witness,

there is no doubt that he would have been incompetent. The only question is, whether the objection came in time to exclude him.

The rule that witnesses shall be objected to at the time of their examination is designed, not only to enable the party offering them to remove the incompetency, if practicable, or to supply by other evidence the want of their testimony, as suggested in the case of *Neville* v. *Demeritt,* 1 *Green's Ch.* 334, and *Mohawk Bank* v. *Atwater,* 2 *Paige* 60, but rests upon another reason of greater cogency, which does not permit the adverse party to sit by and hear the witness examined without objection, and failing to make anything out of him, to interpose the objection to competency. The objection to Graham came too late to avail the defendants, and therefore his testimony cannot be excluded. Any other rule would lead to great unfairness in practice.

Greenleaf, in his first volume on evidence, states it to be the well established rule, that if the opposite party is aware of the ground of objection, he will not be permitted to examine the witness, and afterwards object to his testimony if he should dislike it; he has his election to admit an incompetent witness to testify against him or not, but he must make his election as soon as the opportunity arises, and failing to make it then, he is presumed to have waived it forever. In this case the incompetency of Graham was known to the adverse party at the time he was sworn, and he was bound to interpose his objection then. This point is expressly ruled in *Donelson* v. *Taylor,* 8 *Pick.* 390, and upon examination it will be found that the cases cited by the Chancellor are not in conflict with it. In the case of the *Mohawk Bank* v. *Atwater, supra,* it expressly appears that the interest of the witness was not known until some weeks after he was examined, and therefore no objection could have been made at the time of his examination; and in *Neville* v. *Demeritt, supra,* the Chancellor says, that the witness should be objected to at the time of his examination.

Berryman and his wife, who were wholly unacquainted

with the dry goods business, were introduced to Graham by one Alexander Just, who claimed to have the necessary experience, and who was to conduct the business for the wife, if the purchase was made. The evidence in this cause shows, that a large portion of the goods sold to Mrs. Berryman was old and unsaleable, and that the price paid by her was far above their actual value, and the direct evidence and circumstances of the case are inconsistent with the belief that Graham did not participate in the fraudulent practices, by which the sale was effected. The quantity and cost price of the goods were ascertained by the employees of Graham, before the stock was transferred, and the measurements and cost prices of the goods were written down by Aitken, a partner of Graham. Mrs. Berryman took the goods at this measurement, with an abatement of ten per cent. from what this schedule stated to be the cost price. It seems very clear from the evidence that it was a hard bargain, by which Graham sought to put off on a woman who knew no more about the business than a child, an old, faded stock of store goods, at an exorbitant price, and if fraud can be fairly gathered from the evidence, she should be relieved.

Hornidge, Foy, and McGrath, three of Graham's clerks at the time the inventory was taken, swear distinctly that they marked the goods in excess of the true measurement, as well as the cost prices. They say that Graham did not tell them to do so, but it was understood that the goods were to be marked up in both quantity and price. They understood it to be a part of their duty, as clerks in the complainant's store, to mark up the goods; they needed no express instructions.

It is insisted that their testimony is not to be credited because they participated in the fraud; but if this rule is applied, few frauds can be uncovered, as it is necessary in almost all cases to resort to the testimony of those who, to some extent, aid in the imposition. These witnesses have nothing to gain by false testimony; they testify directly and

positively to facts about which they cannot be mistaken; their statements are true or willfully false. They could have had no conceivable object in perjuring themselves, except to injure Graham or assist Berryman, and in either case, they would have expressly stated that Graham directed them to commit the wrong. The very fact that they acknowledge their error is evidence of their truthfulness. They say that it was not an unusual thing for some mercantile houses to mark up their goods, and therefore they did not look upon it in its true light as a gross fraud. Foy says that the July inventory was correct, and that the August inventory, at which the defendants bought, was marked up from that. In this Foy is evidently mistaken, as appears by inspecting the two inventories, and as the July inventory was prepared for the purpose of selling the stock to some Jews, there is no reason to doubt that if the goods were marked up in August, they would also have been marked up in July.

Thomas Porter testifies that Just employed him to come to the store and assist in taking the inventory, and that during that week Graham met him somewhere, and said to him that he might consider himself in his (Graham's) employ. Why did Graham attempt to tamper in this way with a man employed by Just to look after Mrs. Berryman's interest? Was not this a covert offer of a bribe to Porter, not to look too carefully after false measures and unfair prices? Just being a poor inebriate, and Berryman and his wife being absent, there would have been no one to detect or expose the wrong. Graham attempts to explain this strange conduct by the cross-examination of Porter. Porter says, Graham told him that the reason he might consider himself in Graham's employ was, because Just had old debts which he was afraid might lien on the stock. This reason is not satisfactory, and was evidently intended to prevent any suspicion in Porter's mind, because there was no pretence that Just had bought the goods and there could be no such danger. This reason assigned to Porter, taken in connection

with the fact that Graham kept away from the store while the inventory was taken, is very significant. Here was a stock of goods to the value of almost $10,000, which Graham had contracted to sell. He goes to the store and says to Gage, his foreman, take the account at exactly what the goods cost, and then carefully absents himself while the measurements are made and the accounts taken, although he is afraid Just's creditors may seize his goods, and he leaves three clerks, who are now said to be entirely unworthy of credit, to ascertain quantity and price. Porter, whose credit is not in any way impeached, fully corroborates the three clerks, by testifying positively that as soon as the inventory was completed he found short measurements, and that Just complained to Gage both of short measures and unfair prices, and charged Gage directly with having marked up the cost prices. Gage admits that before Berryman took possession, Just said to Gage that the goods were marked up, and Gage said they were not; but Gage does not pretend that he made, or offered to make any examination to satisfy Just that he was mistaken, although they were in the store at the time. If the inventory had been fair and would have stood the test of an examination, there can be no doubt at all that Gage, when his own integrity was directly called in question, would have said: Sir, examine the bills and make the measurements for yourself; I will not rest under this imputation. But he did nothing of the kind; he contented himself with a quiet denial of the charge.

It appears from the testimony of some of the witnesses, that Gage was to have the proceeds of the sale after Graham realized a certain amount, and therefore Gage was directly interested in running up the prices.

It also appears that when Aitken was writing the inventory, Just charged that the measurements and prices were wrong, and Aitken immediately in two cases made a reduction, without the least examination. The charge made by Just impeached the whole inventory, and Aitken, if it had

been an honest transaction, would have insisted upon an immediate inspection of the goods; this conduct raises a strong presumption that he made the correction for the very purpose of preventing investigation. Graham offered Just as a witness, and Just does not deny in his testimony that he distinctly charged both Gage and Aitken with fraud. The goods really belonged to Graham and Aitken as partners, yet Moore and other clerks in the store were given to understand that they belonged to Gage, and when they were sold to Mrs. Berryman the mortgage was taken by Graham alone, although Graham himself testifies that Aitken then owned and still owns one-half interest in the notes. Graham had a purpose in these things, and they are not explained in a way which is consistent with his good faith.

Graham states in his answer to the cross-bill, that he had been offered ten per cent. more for the goods than he received from Mrs. Berryman, but that he refused to sell for want of proper security; yet he sold to Mrs. Berryman for ten per cent. less than he had been offered, and took as his only security a mortgage on property he knew nothing at all about, either as to title, value or encumbrances, and without making the slightest inquiry about it, even of Berryman or Just. The terms of the bargain were half cash, and the balance on mortgage; yet at the mere suggestion of Berryman, Graham consented to take a mortgage for the whole of the purchase price, on this property of which he knew nothing. Nothing but the greatest eagerness to carry to completion a most advantageous bargain would have induced such action on the part of Graham. There is a circumstance in this case which leads very strongly to the belief that Just was in complicity with Graham, and that he was to share in the profits of the sale. The last of the six notes secured by the mortgage in question, was not endorsed by Just until the twentieth day of June, 1867. That note was payable to the order of Just, and therefore could not be negotiated by Graham without the enderse-

ment of Just. Why was that last note passed into the hands of Graham without the signature of Just on it? Is it not fair to presume that Just intended to retain some hold on this note for his services in accomplishing the sale? Graham was a business man, and knew it was necessary to have Just's endorsement on it, and although he was on the witness stand he did not explain the omission.

What is there to outweigh the positive testimony of four witnesses, who are in a position to know of what they speak, supported so strongly by the circumstances referred to? The only testimony on the other side is that of Gage, Moore, Aitken, and Graham. Moore only speaks of what he did himself; he says he don't know that the goods were marked up; he did not do it. Besides, he was quite deaf and could hear but little that passed. Gage did not clear up the direct charge of fraud against himself when he might have done so, and neither he nor Aitken pretend to have measured the goods, or to have seen them all measured. Aitken and Graham purposely placed themselves in a position where they could swear they did not see the fraud committed.

The complainant insists that Mrs. Berryman should have set up her defence sooner. She was no doubt kept in ignorance by Just, and she did not learn the names of the witnesses by whom she could prove the fraud, until the taking of testimony in this cause. It does not appear that she was in a position at any earlier time to seek for redress. As it cannot be denied that the equity of the case is with Mrs. Berryman, this court should not, unless constrained by very strong evidence to do so, discard the sworn testimony of four disinterested, direct, and positive witnesses, upon whose statements, if true, the clear right of the case can be reached. The weight of evidence establishes the fraud and fixes Graham with a knowledge of it. It would seem from the evidence before us, that the goods were marked up from twenty to forty per cent. above their true value and actual measurement.

But if the fraud was perpetrated without Graham's knowl-

edge, there has been a mistake in the estimate of the value of the goods according to the contract between the parties, against which equity will relieve, and it should be relieved against under the bill as framed in this case. *Read's Adm'r v. Cramer,* 1 *Green's Ch.* 277.

The counsel of appellants insist that Aitken was a necessary party to these proceedings, and that they are entitled to the advantage of a want of necessary parties in this cause. It seems clear that Aitken might have been made a party to the bill of complaint; but proper parties are not always necessary parties. As the case now stands, the question whether he was a necessary party does not arise. No objection was made on that ground before the Chancellor, nor was the want of Aitken's presence made a ground of appeal in this case. This court therefore should not permit this question to be raised, unless the party omitted is an indispensable party, and justice cannot be done without him.

The complainants in the cross-bill are entitled to relief and to a credit upon the mortgage, as of the date thereof, of the amount at which the goods were estimated in excess of the contract price, to be ascertained under the direction of the Chancellor. In making such estimate, the goods are to be taken at their true measurement, and ten per cent. to be abated from their actual cost price. The case should be remitted with the requisite instructions.

The decree was reversed by the following vote:

*For reversal*—BEASLEY, C. J., BEDLE, CLEMENT, DALRIMPLE, KENNEDY, VAIL, VAN SYCKEL, WALES. 8.

*For affirmance*—DEPUE, OGDEN, OLDEN, WOODHULL. 4.